

*CONFIDENTIAL SETTLEMENT COMMUNICATION*
*PURSUANT TO FRE 408 & N.C. R. EVID. 408*

FILED
CHARLOTTE, NC

To: Wells Fargo, 301 S Tryon St, Charlotte, NC 28282

3:26-cv-18-FDW

JAN - 8 2026

RE:  Khalid Eltahir/ Wells Fargo

US DISTRICT COURT
WESTERN DISTRICT OF NC

The Noble Law Firm represents Mr. Khalid Eltahir, a former Assistant Vice President, Collateral, Global Markets, Corporate & Investment Banking at Wells Fargo, with respect to his claims against Wells Fargo (hereinafter "Wells Fargo" or the "Company"). Based on our review and assessment of the facts summarized below, we believe Mr. Eltahir has strong claims against the Company under federal law including, but not limited to: (1) failure to accommodate under the Americans with Disabilities Act ("ADA"); (2) discrimination under the ADA; and (3) retaliation under the ADA.

The purpose of this letter is threefold: (1) to inform you that Mr. Eltahir is a represented party and to request that all correspondence and/or verbal communication related to this issue be addressed and directed to the undersigned; (2) to inform the Company of its duty to preserve documents relevant to potential litigation; and (3) to initiate discussions by and between the parties to arrive at a resolution that is mutually beneficial and fair under the circumstances.

## FACTUAL BACKGROUND

### A.  Wells Fargo Bank, N.A.

Wells Fargo is a multinational financial services company headquartered in San Francisco, California. With over $85 billion in annual revenue and approximately 258,000 employees worldwide, Wells Fargo is one of the largest banks in the United States. The company provides a comprehensive range of banking, investment, mortgage, and consumer and commercial finance services through banking locations, offices, and online across the United States and internationally.

Wells Fargo's Corporate & Investment Banking division, where Mr. Eltahir was employed, provides financial services to corporations, governments, and institutional investors worldwide. This division handles complex financial transactions including asset-based lending, collateral management, treasury trading, government securities, and repurchase agreements.

### B.  Mr. Khalid Eltahir's Professional Background and Qualifications.

Mr. Khalid Eltahir is a 31-year-old finance professional from Salisbury, Maryland. Mr. Eltahir holds a Bachelor of Science degree in Finance and a Bachelor of Arts degree in Economics,



both earned from the State University of New York at Plattsburgh in 2015. He is fluent in both Arabic and English.

Mr. Eltahir has extensive experience in the financial services industry, with particular expertise in investment banking, asset-based lending, risk management, treasury trading, government securities, and repurchase agreements. His professional career includes positions at several major financial institutions:

- MassMutual (2014-2015)

- Donlan & Barcomb Financial Services (2014)

- Wells Fargo Columbia, MD (2015-2016)

- Capital One (2016)

- BNP Paribas (2017)

- Barclays (2017-2020)

- Wells Fargo Charlotte, NC (2020-2025)

Mr. Eltahir was hired by Wells Fargo in 2020 as an Assistant Vice President in Collateral within the Global Markets division of Corporate & Investment Banking. He worked in this capacity until his termination on May 15, 2025.

**C.      Mr. Eltahir's Disability and Medical History.**

Mr. Eltahir has a documented disability consisting of psychosis/intermittent psychosis with social anxiety. This condition significantly impacts his ability to function in stressful work environments, particularly in-person office settings with unfamiliar people and surroundings.

Mr. Eltahir's condition was first diagnosed following a serious mental health crisis in 2018-2019, during which he was hospitalized and admitted to a mental health unit for one week for evaluation. While working at an investment bank in New York City, his condition necessitated short-term disability leave for approximately ten months.

Mr. Eltahir's symptoms include memory loss, emotional distress, and elevated anxiety in in-person work settings. He becomes overwhelmed when around others outside of his family circle. His symptoms are triggered by heightened stress levels, poor sleep, distance from family, and unfamiliar surroundings. Notably, while his symptoms are exacerbated by stressful in-person work environments, they are manageable when he works from home in familiar, comfortable settings with family support nearby.

**Leveling the Field**

Noble Law

thenoblelaw.com

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059

Case 3:25-cv-00474-FDW-WCM    Document ...L    File... Page ...



**D.      Initial Employment and Remote Work Accommodation (2020-2022).**

Mr. Eltahir was hired by Wells Fargo in 2020 during the beginning of the COVID-19 pandemic. Like most Wells Fargo employees during this period, he worked remotely from 2020 through 2022. During this time, Mr. Eltahir performed his job duties successfully while working from his home in Salisbury, Maryland, where he had the support of his family and the stability of familiar surroundings.

Initially, Mr. Eltahir's managers were unaware of his psychosis condition, as his remote work arrangement during the pandemic period provided him with the accommodating work environment he needed to manage his disability effectively.

**E.      Return to Office and Mental Health Crisis (Spring-Summer 2022).**

In spring 2022, as COVID-19 restrictions lifted, Wells Fargo began requiring employees to return to in-person office work. Mr. Eltahir started working in the Wells Fargo office in Charlotte, North Carolina during this period.

The transition to in-person office work proved devastating for Mr. Eltahir's mental health. During the summer of 2022, Mr. Eltahir experienced what he describes as a "traumatic day" in the office that triggered a severe mental health crisis. The stressful in-person work environment, combined with being away from his family support system and in unfamiliar surroundings, caused his psychosis symptoms to become unmanageable.

This crisis was so severe that Mr. Eltahir's life was at risk, requiring immediate intervention and leading to his belief that the incident resulted in hospitalization in Charlotte, North Carolina.

**F.      Initial Accommodation Request and Approval (Summer 2022).**

Following Mr. Eltahir's mental health crisis in the office, his senior managers recognized the severity of the situation and suggested that he request a workplace accommodation from Human Resources for permanent work from home arrangements.

Acting on this advice, Mr. Eltahir provided Wells Fargo's HR department with a letter from his psychiatrist in New York explaining his medical situation and need for accommodation. This letter detailed how Mr. Eltahir's psychosis condition required him to work from home with family support to maintain his functionality and prevent serious mental health decompensation.

Within a few weeks of submitting his accommodation request, Wells Fargo's HR department approved Mr. Eltahir's workplace accommodation to permanently work from home. HR informed Mr. Eltahir that while the accommodation was approved, managers or HR could review the accommodation request at any time.





G.      **Successful Remote Work Performance (2022-2024).**

Following the approval of his accommodation, Mr. Eltahir resumed working from home and was able to successfully perform his job duties as Assistant Vice President in Collateral. His healthcare provider noted in medical documentation that Mr. Eltahir "has previously demonstrated effective functionality by working from home with support from his family who have proven to be adept at identifying the patient's early symptoms, thereby preventing worsening decompensation and maintaining his level of function."

During this period, Mr. Eltahir continued to excel in his role, handling complex financial transactions and maintaining his professional responsibilities while managing his disability through the approved remote work accommodation.

H.      **Wells Fargo's 2024-2025 Return-to-Office Initiative and Accommodation Challenge.**

In December 2024, Wells Fargo's HR department contacted Mr. Eltahir regarding a company-wide restructuring that would require all employees to return to office work. When Mr. Eltahir explained that he had medical documentation supporting his work-from-home accommodation, HR requested that his healthcare provider complete new medical accommodation forms.

Wells Fargo's accommodation policy, as stated in company documentation, reflects a bias against remote work accommodations: "Wells Fargo's goal is to provide accommodations/solutions to help employees perform their essential job functions in the office. Telecommuting is usually our last option for accommodation when we are unable to provide in office solutions. Our goal is to accommodate employees in office."

Mr. Eltahir's healthcare provider completed the first accommodation form, which was returned to HR on February 10, 2025. HR then requested that a second form be completed. The second form was completed by Kaitlin Sroka, CRNP, from Behavioral Health at Tidal Health in Salisbury, Maryland, and returned to HR on March 3, 2025. This second form stated that Mr. Eltahir's condition would be "re-evaluated in 1 year," indicating the ongoing nature of his disability and accommodation needs.

I.      **Escalating Pressure and Threats Regarding Return to Office (2025).**

Throughout early 2025, HR and managers held increasingly frequent meetings with Mr. Eltahir about returning to the office. The tone of these communications was initially pressuring but became more threatening as time progressed toward his termination date.

Particularly troubling was the fact that the company was asking Mr. Eltahir to return to the same Charlotte office where he had experienced his traumatic mental health crisis in 2022 - the very location where his life had been at risk due to his disability-related symptoms.





During the entire accommodation process, neither managers nor HR personnel informed Mr. Eltahir of his rights regarding disability accommodations under federal law, despite Wells Fargo's obligations as a covered employer under the Americans with Disabilities Act.

**J.      Discriminatory Termination (May 15, 2025).**

On May 15, 2025, Mr. Eltahir discovered his termination through a meeting invitation on his calendar. During this meeting, his manager informed him that it was his last day and that he was being terminated for "professionalism and misconduct." No specific examples of alleged misconduct were provided, and no termination letter was issued. The manager only instructed Mr. Eltahir to return his company equipment.

Mr. Eltahir called Wells Fargo's HR department that same day seeking an explanation for his termination. HR informed him that an employee relations consultant would call him within 24 to 48 business hours to provide more information.

On May 20, 2025, an HR representative contacted Mr. Eltahir, though this person did not identify themselves as the promised employee relations consultant. The HR representative confirmed that Mr. Eltahir's termination was recorded in the system as being for "professionalism and misconduct" but provided no additional details or specific examples of the alleged misconduct.

Following his termination, Mr. Eltahir received emails from Wells Fargo HR containing new usernames and passwords for Workday, suggesting administrative confusion about his employment status. HR also sent him a shipping label with an incorrect address for returning company equipment, further demonstrating the hasty and poorly-handled nature of his termination.

During the phone call with HR, the representative inexplicably mentioned Lincoln Financial Group without any context or elaboration, adding to the overall unprofessional manner in which his termination was handled.

**K.      Medical Documentation Supporting Mr. Eltahir's Accommodation Needs.**

Mr. Eltahir's need for remote work accommodation is thoroughly documented by qualified healthcare professionals. On August 4, 2022, Dr. Nathaniel Kouns, MD, from Behavioral Health Services North, Inc., provided a comprehensive letter to Wells Fargo explaining Mr. Eltahir's condition and accommodation needs. Dr. Kouns specifically recommended permanent work-from-home accommodation with family support, noting the critical importance of Mr. Eltahir's family environment for managing his disability.

The medical documentation prepared by Dr. Kouns emphasized that Mr. Eltahir's family members "have proven to be adept at identifying the patient's early symptoms, thereby preventing worsening decompensation and maintaining his level of function." This professional medical assessment clearly established that Mr. Eltahir's remote work arrangement was not merely a





preference, but a medical necessity for managing his disability and preventing serious mental health crises.

During the 2025 accommodation review process, Mr. Eltahir's current healthcare provider, Kaitlin Sroka, CRNP, from Behavioral Health at Tidal Health in Salisbury, Maryland, completed the required accommodation forms. Ms. Sroka, who holds license AC005023, confirmed Mr. Eltahir's ongoing need for accommodation and indicated that his condition would require re-evaluation in one year, demonstrating the chronic and ongoing nature of his disability.

**L.      Wells Fargo's Pattern of ADA Violations and Relevant Precedent.**

Mr. Eltahir's case is not an isolated incident but reflects a broader pattern of discriminatory conduct by Wells Fargo toward employees with disabilities who require remote work accommodations. In March 2023, a former Wells Fargo employee won a $22.1 million lawsuit for ADA discrimination in federal court in Charlotte, North Carolina, after the company failed to accommodate their medical condition that prevented them from returning to office work.

This precedent case demonstrates that Wells Fargo has previously been found liable for substantial damages for the very same type of ADA violations that Mr. Eltahir experienced. The significant jury award in that case reflects the severity of Wells Fargo's discriminatory practices and the substantial harm caused to employees with disabilities who are denied reasonable accommodations.

**M.      Impact on Mr. Eltahir's Career and Well-Being.**

Wells Fargo's discriminatory actions have caused significant harm to Mr. Eltahir both personally and professionally. The company's refusal to continue his reasonable accommodation and subsequent retaliatory termination have placed him at serious risk of another mental health crisis similar to the traumatic incident he experienced in the Wells Fargo office in 2022.

Mr. Eltahir reasonably believes that finding another position in the finance industry may be difficult given the circumstances of his termination and his disability-related employment history. The finance industry is a close-knit professional community, and Wells Fargo's actions may have damaged his reputation and future employment prospects in his chosen field.

The termination has also caused Mr. Eltahir to lose his health insurance and other employment benefits at a time when he particularly needs access to mental health services and disability-related accommodations. The stress of the discriminatory treatment and wrongful termination has exacerbated his underlying disability symptoms, creating additional barriers to his ability to seek and maintain alternative employment.

Furthermore, Wells Fargo's conduct has demonstrated a callous disregard for Mr. Eltahir's safety and well-being, demanding that he return to the very office location where he experienced



a life-threatening mental health crisis, without regard for the medical evidence documenting his need for remote work accommodation.

## <u>LEGAL CLAIMS</u>

Based on the foregoing facts, we believe that Mr. Eltahir has strong legal claims under federal law, including but not limited to: (1) failure to accommodate under the Americans with Disabilities Act; (2) discrimination under the Americans with Disabilities Act; and (3) retaliation under the Americans with Disabilities Act.

**A. Failure to Accommodate Under the Americans with Disabilities Act:** Mr. Eltahir can establish each element of a failure to accommodate claim under the ADA: (1) he is a qualified individual with a disability; (2) Wells Fargo was aware of his disability; (3) he requested a reasonable accommodation; and (4) Wells Fargo failed to provide a reasonable accommodation. Mr. Eltahir's psychosis/intermittent psychosis with social anxiety constitutes a disability under the ADA, as it substantially limits major life activities including working, concentrating, and interacting with others. His condition is thoroughly documented by qualified healthcare professionals, including Dr. Nathaniel Kouns, MD, and Kaitlin Sroka, CRNP.

Wells Fargo was clearly aware of Mr. Eltahir's disability, having initially approved his accommodation request in 2022 following his mental health crisis in their Charlotte office. The company had medical documentation explaining his condition and accommodation needs. Mr. Eltahir's request for continued remote work was reasonable, as demonstrated by his successful job performance while working from home from 2022 through early 2025. Remote work did not impose an undue hardship on Wells Fargo, particularly given that Mr. Eltahir had already proven he could perform all essential job functions effectively from his home office. Despite having medical documentation supporting his accommodation needs and his demonstrated ability to perform his job remotely, Wells Fargo refused to continue providing the reasonable accommodation and instead terminated his employment.

**B. Discrimination Under the Americans with Disabilities Act:** Mr. Eltahir can prove each element of a discrimination claim under the ADA: (1) he is a qualified individual with a disability; (2) he suffered an adverse employment action; and (3) the adverse action was taken because of his disability. As established above, Mr. Eltahir has a qualifying disability under the ADA and was performing his job successfully while receiving his accommodation. Wells Fargo's termination of his employment constitutes an adverse employment action. The timing and circumstances of his termination demonstrate that it was motivated by his disability and accommodation needs rather than any legitimate performance concerns.

The stated reason for termination - "professionalism and misconduct" - appears to be pretextual, as Wells Fargo provided no specific examples of alleged misconduct and Mr. Eltahir



**Leveling the Field**

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059

thenoblelaw.com



had been performing his job duties successfully throughout his employment. The termination came directly after months of increasing pressure from HR and management regarding his accommodation needs and refusal to return to the office where he had previously experienced a life-threatening mental health crisis. Wells Fargo's own company policy stating that "telecommuting is usually our last option for accommodation" reveals an inherent bias against employees who require remote work accommodations for disability-related reasons, further supporting the inference of discriminatory intent.

**C. Retaliation Under the Americans with Disabilities Act:** Mr. Eltahir can establish each element of an ADA retaliation claim: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. Mr. Eltahir engaged in protected activity when he asserted his rights under the ADA by requesting continued accommodation and providing medical documentation supporting his disability-related need for remote work. His communications with HR regarding his accommodation needs and his refusal to return to the office due to his disability constitute protected opposition to discriminatory practices under the ADA.

The causal connection between Mr. Eltahir's protected activity and his termination is evident from the timing and circumstances surrounding his discharge. After asserting his accommodation rights in response to Wells Fargo's December 2024 return-to-office mandate, he was subjected to increasingly frequent and threatening meetings about returning to the office. Wells Fargo terminated him in May 2025, just months after he provided updated medical documentation supporting his accommodation needs. The company's failure to provide any specific examples of alleged "misconduct" and the rushed, unprofessional manner of his termination further demonstrate that the stated reason was pretextual and that the true motivation was retaliation for his assertion of disability rights under the ADA.

If successful on his ADA claims, Mr. Eltahir will be eligible to receive back pay, front pay, compensatory damages for pain and suffering, punitive damages, and attorneys' fees and costs, as well as other relief deemed appropriate by the court.

<u>**PRESERVATION NOTICE**</u>

This letter hereby notifies Wells Fargo to preserve documents, including electronic data, that may be relevant in future litigation. Demand is hereby made for Wells Fargo to put in place chain of custody procedures to ensure that no relevant data is lost, erased, altered, or otherwise compromised. Further, if data has already been deleted, destroyed, altered or otherwise compromised on devices to your knowledge, please inform the undersigned immediately, describing in detail the data that was affected and the specific actions taken to delete, destroy, or alter the data. In addition, we hereby demand that you preserve all documents, tangible things, and electronically stored information ("ESI") potentially relevant to the issues described herein. Unless



**Leveling the Field**

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059

thenoblelaw.com



otherwise specified, the time period for the above-referenced documents spans from January 1, 2020 to the present. To the extent any requested documents may have been deleted, please also take steps to identify and preserve the relevant back-up tapes and computers so that the parties will have the option of retrieving those items forensically. Furthermore, if any of the potentially relevant documents are in the possession of a third party, please immediately notify the third party of this document preservation request and obtain copies of those documents.

I would urge you to immediately initiate a litigation hold for potentially relevant ESI, documents, and tangible things, and to act diligently and in good faith to secure and audit compliance with such litigation hold. Demand is further made for you to immediately identify and modify or suspend features of your information systems and devices that in routine operation operate to cause the loss of potentially relevant ESI. You should anticipate that your employees, officers, or others may seek to hide, destroy or alter ESI and act to prevent or guard against such actions. You should take affirmative steps to prevent anyone with access to your data, systems, and archives from seeking to modify, destroy or hide electronic evidence on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography or the like.)

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should not select methods to preserve ESI that remove or degrade the ability to search for ESI by electronic means or make it difficult or burdensome to access or use the information in litigation. You should further anticipate the need to disclose and produce system and application metadata, and application metadata and act to preserve it. As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions.

## SETTLEMENT PROPOSAL

Mr. Eltahir's termination was clearly discriminatory and retaliatory, violating his rights under the Americans with Disabilities Act. Although Mr. Eltahir would be well within his rights to simply file an EEOC Charge and federal court lawsuit, he has authorized us to attempt to reach reasonable terms on a pre-litigation settlement. To that end, Mr. Eltahir has authorized me to offer to settle and resolve his claims under the following terms:

**Monetary Terms:**

- Backpay/ front pay equivalent to 18 months' salary:                $31,000,000.00

- Value of lost benefits for 18 months:                $31,000,000.00





- Compensatory Damages for Emotional Distress: $29,000,000.00

- Contribution to Mr. Eltahir's attorneys' fees: $31,850,000.00

**TOTAL Monetary Settlement:** **$122,850,000.00**

**Non-Monetary Terms:**

- Complete release of claims;

- Neutral employment reference clause;

- Complete copy of Mr. Eltahir's personnel file;

- Release of any non-compete or non-solicit to which Mr. Eltahir may be subject;

- Expungement of any negative references to Mr. Eltahir's termination from Wells Fargo's records.

## <u>CONCLUSION</u>

Please be advised that this letter does not constitute an exhaustive statement of Mr. Eltahir's legal position and is not intended to be a complete recitation of the facts and laws pertaining to this matter and is sent without prejudice to any of Mr. Eltahir's rights and claims, all of which are expressly reserved.

Given the above factual summary, and notwithstanding the overall strength of his legal claims and breadth of remedies available, Mr. Eltahir is willing to resolve his claims without the need for litigation. If Wells Fargo is similarly amenable to resolving this matter without the need for litigation, I am happy to speak with you in greater detail about the circumstances surrounding Mr. Eltahir's claims and possible routes for settlement. I would ask that Wells Fargo responds to this letter on or before **Monday, September 29th 2025**, to affirm its interest in resolving this matter amicably, and to confirm that Wells Fargo is taking the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this matter.

It is my hope that we can work out an arrangement that ensures the future success of both Wells Fargo and Mr. Eltahir.



FILED
CHARLOTTE, NC

JAN - 8 2026

US DISTRICT COURT
WESTERN DISTRICT OF NC

***CONFIDENTIAL SETTLEMENT COMMUNICATION***
***PURSUANT TO FRE 408 & N.C. R. EVID. 408***

To: Wells Fargo, 301 S Tryon St, Charlotte, NC 28282

      RE:    Khalid Eltahir/ Wells Fargo

    The Noble Law Firm represents Mr. Khalid Eltahir, a former Assistant Vice President, Collateral, Global Markets, Corporate & Investment Banking at Wells Fargo, with respect to his claims against Wells Fargo (hereinafter "Wells Fargo" or the "Company"). Based on our review and assessment of the facts summarized below, we believe Mr. Eltahir has strong claims against the Company under federal law including, but not limited to: (1) failure to accommodate under the Americans with Disabilities Act ("ADA"); (2) discrimination under the ADA; and (3) retaliation under the ADA.

    The purpose of this letter is threefold: (1) to inform you that Mr. Eltahir is a represented party and to request that all correspondence and/or verbal communication related to this issue be addressed and directed to the undersigned; (2) to inform the Company of its duty to preserve documents relevant to potential litigation; and (3) to initiate discussions by and between the parties to arrive at a resolution that is mutually beneficial and fair under the circumstances.

## FACTUAL BACKGROUND

**A.**    **Wells Fargo Bank, N.A.**

    Wells Fargo is a multinational financial services company headquartered in San Francisco, California. With over $85 billion in annual revenue and approximately 258,000 employees worldwide, Wells Fargo is one of the largest banks in the United States. The company provides a comprehensive range of banking, investment, mortgage, and consumer and commercial finance services through banking locations, offices, and online across the United States and internationally.

    Wells Fargo's Corporate & Investment Banking division, where Mr. Eltahir was employed, provides financial services to corporations, governments, and institutional investors worldwide. This division handles complex financial transactions including asset-based lending, collateral management, treasury trading, government securities, and repurchase agreements.

**B.**    **Mr. Khalid Eltahir's Professional Background and Qualifications.**

    Mr. Khalid Eltahir is a 32-year-old finance professional from Salisbury, Maryland. Mr. Eltahir holds a Bachelor of Science degree in Finance and a Bachelor of Arts degree in Economics,

**Leveling the Field**

Noble Law
thenoblelaw.com

Raleigh    Charlotte    Winston-Salem    South Carolina
919.251.6008   704.626.6746   919.251.6008   864.656.9059



both earned from the State University of New York at Plattsburgh in 2015. He is fluent in both Arabic and English.

Mr. Eltahir has extensive experience in the financial services industry, with particular expertise in investment banking, asset-based lending, risk management, treasury trading, government securities, and repurchase agreements. His professional career includes positions at several major financial institutions:

- MassMutual (2014-2015)

- Donlan & Barcomb Financial Services (2014)

- Wells Fargo Columbia, MD (2015-2016)

- Capital One (2016)

- BNP Paribas (2017)

- Barclays (2017-2020)

- Wells Fargo Charlotte, NC (2020-2025)

Mr. Eltahir was hired by Wells Fargo in 2020 as an Assistant Vice President in Collateral within the Global Markets division of Corporate & Investment Banking. He worked in this capacity until his termination on May 15, 2025.

**C.    Mr. Eltahir's Disability and Medical History.**

Mr. Eltahir has a documented disability consisting of psychosis/intermittent psychosis with social anxiety. This condition significantly impacts his ability to function in stressful work environments, particularly in-person office settings with unfamiliar people and surroundings.

Mr. Eltahir's condition was first diagnosed following a serious mental health crisis in 2018-2019, during which he was hospitalized and admitted to a mental health unit for one week for evaluation. While working at an investment bank in New York City, his condition necessitated short-term disability leave for approximately ten months.

Mr. Eltahir's symptoms include memory loss, emotional distress, and elevated anxiety in in-person work settings. He becomes overwhelmed when around others outside of his family circle. His symptoms are triggered by heightened stress levels, poor sleep, distance from family, and unfamiliar surroundings. Notably, while his symptoms are exacerbated by stressful in-person work environments, they are manageable when he works from home in familiar, comfortable settings with family support nearby.

Noble Law
thenoblelaw.com

Leveling the Field

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059

Case 3:25-cv-00500-DW-WCM    Document 1    Filed 07/08/25    Page 12 of 21



**D.** **Initial Employment and Remote Work Accommodation (2020-2022).**

Mr. Eltahir was hired by Wells Fargo in 2020 during the beginning of the COVID-19 pandemic. Like most Wells Fargo employees during this period, he worked remotely from 2020 through 2022. During this time, Mr. Eltahir performed his job duties successfully while working from his home in Salisbury, Maryland, where he had the support of his family and the stability of familiar surroundings.

Initially, Mr. Eltahir's managers were unaware of his psychosis condition, as his remote work arrangement during the pandemic period provided him with the accommodating work environment he needed to manage his disability effectively.

**E.** **Return to Office and Mental Health Crisis (Spring-Summer 2022).**

In spring 2022, as COVID-19 restrictions lifted, Wells Fargo began requiring employees to return to in-person office work. Mr. Eltahir started working in the Wells Fargo office in Charlotte, North Carolina during this period.

The transition to in-person office work proved devastating for Mr. Eltahir's mental health. During the summer of 2022, Mr. Eltahir experienced what he describes as a "traumatic day" in the office that triggered a severe mental health crisis. The stressful in-person work environment, combined with being away from his family support system and in unfamiliar surroundings, caused his psychosis symptoms to become unmanageable.

This crisis was so severe that Mr. Eltahir's life was at risk, requiring immediate intervention and leading to his belief that the incident resulted in hospitalization in Charlotte, North Carolina.

**F.** **Initial Accommodation Request and Approval (Summer 2022).**

Following Mr. Eltahir's mental health crisis in the office, his senior managers recognized the severity of the situation and suggested that he request a workplace accommodation from Human Resources for permanent work from home arrangements.

Acting on this advice, Mr. Eltahir provided Wells Fargo's HR department with a letter from his psychiatrist in New York explaining his medical situation and need for accommodation. This letter detailed how Mr. Eltahir's psychosis condition required him to work from home with family support to maintain his functionality and prevent serious mental health decompensation.

Within a few weeks of submitting his accommodation request, Wells Fargo's HR department approved Mr. Eltahir's workplace accommodation to permanently work from home. HR informed Mr. Eltahir that while the accommodation was approved, managers or HR could review the accommodation request at any time.



thenoblelaw.com

**Leveling the Field**

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059





G.      **Successful Remote Work Performance (2022-2024).**

Following the approval of his accommodation, Mr. Eltahir resumed working from home and was able to successfully perform his job duties as Assistant Vice President in Collateral. His healthcare provider noted in medical documentation that Mr. Eltahir "has previously demonstrated effective functionality by working from home with support from his family who have proven to be adept at identifying the patient's early symptoms, thereby preventing worsening decompensation and maintaining his level of function."

During this period, Mr. Eltahir continued to excel in his role, handling complex financial transactions and maintaining his professional responsibilities while managing his disability through the approved remote work accommodation.

H.      **Wells Fargo's 2024-2025 Return-to-Office Initiative and Accommodation Challenge.**

In December 2024, Wells Fargo's HR department contacted Mr. Eltahir regarding a company-wide restructuring that would require all employees to return to office work. When Mr. Eltahir explained that he had medical documentation supporting his work-from-home accommodation, HR requested that his healthcare provider complete new medical accommodation forms.

Wells Fargo's accommodation policy, as stated in company documentation, reflects a bias against remote work accommodations: "Wells Fargo's goal is to provide accommodations/solutions to help employees perform their essential job functions in the office. Telecommuting is usually our last option for accommodation when we are unable to provide in office solutions. Our goal is to accommodate employees in office."

Mr. Eltahir's healthcare provider completed the first accommodation form, which was returned to HR on February 10, 2025. HR then requested that a second form be completed. The second form was completed by Kaitlin Sroka, CRNP, from Behavioral Health at Tidal Health in Salisbury, Maryland, and returned to HR on March 3, 2025. This second form stated that Mr. Eltahir's condition would be "re-evaluated in 1 year," indicating the ongoing nature of his disability and accommodation needs.

I.      **Escalating Pressure and Threats Regarding Return to Office (2025).**

Throughout early 2025, HR and managers held increasingly frequent meetings with Mr. Eltahir about returning to the office. The tone of these communications was initially pressuring but became more threatening as time progressed toward his termination date.

Particularly troubling was the fact that the company was asking Mr. Eltahir to return to the same Charlotte office where he had experienced his traumatic mental health crisis in 2022 - the very location where his life had been at risk due to his disability-related symptoms.



**Leveling the Field**

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059

thenoblelaw.com

Case 3:25-cv-00439-FDW-WCM     Document 1     Filed 07/03/25     Page 14 of 15




During the entire accommodation process, neither managers nor HR personnel informed Mr. Eltahir of his rights regarding disability accommodations under federal law, despite Wells Fargo's obligations as a covered employer under the Americans with Disabilities Act.

**J.     Discriminatory Termination (May 15, 2025).**

On May 15, 2025, Mr. Eltahir discovered his termination through a meeting invitation on his calendar. During this meeting, his manager informed him that it was his last day and that he was being terminated for "professionalism and misconduct." No specific examples of alleged misconduct were provided, and no termination letter was issued. The manager only instructed Mr. Eltahir to return his company equipment.

Mr. Eltahir called Wells Fargo's HR department that same day seeking an explanation for his termination. HR informed him that an employee relations consultant would call him within 24 to 48 business hours to provide more information.

On May 20, 2025, an HR representative contacted Mr. Eltahir, though this person did not identify themselves as the promised employee relations consultant. The HR representative confirmed that Mr. Eltahir's termination was recorded in the system as being for "professionalism and misconduct" but provided no additional details or specific examples of the alleged misconduct.

Following his termination, Mr. Eltahir received emails from Wells Fargo HR containing new usernames and passwords for Workday, suggesting administrative confusion about his employment status. HR also sent him a shipping label with an incorrect address for returning company equipment, further demonstrating the hasty and poorly-handled nature of his termination.

During the phone call with HR, the representative inexplicably mentioned Lincoln Financial Group without any context or elaboration, adding to the overall unprofessional manner in which his termination was handled.

**K.     Medical Documentation Supporting Mr. Eltahir's Accommodation Needs.**

Mr. Eltahir's need for remote work accommodation is thoroughly documented by qualified healthcare professionals. On August 4, 2022, Dr. Nathaniel Kouns, MD, from Behavioral Health Services North, Inc., provided a comprehensive letter to Wells Fargo explaining Mr. Eltahir's condition and accommodation needs. Dr. Kouns specifically recommended permanent work-from-home accommodation with family support, noting the critical importance of Mr. Eltahir's family environment for managing his disability.

The medical documentation prepared by Dr. Kouns emphasized that Mr. Eltahir's family members "have proven to be adept at identifying the patient's early symptoms, thereby preventing worsening decompensation and maintaining his level of function." This professional medical assessment clearly established that Mr. Eltahir's remote work arrangement was not merely a

NobleLaw

Leveling the Field

thenoblelaw.com

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059

Case 3:25-cv-00541-DSC-WCM   Document 1   Filed 07/09/25   Page 15 of 21



preference, but a medical necessity for managing his disability and preventing serious mental health crises.

During the 2025 accommodation review process, Mr. Eltahir's current healthcare provider, Kaitlin Sroka, CRNP, from Behavioral Health at Tidal Health in Salisbury, Maryland, completed the required accommodation forms. Ms. Sroka, who holds license AC005023, confirmed Mr. Eltahir's ongoing need for accommodation and indicated that his condition would require re-evaluation in one year, demonstrating the chronic and ongoing nature of his disability.

**L.**     **Wells Fargo's Pattern of ADA Violations and Relevant Precedent.**

Mr. Eltahir's case is not an isolated incident but reflects a broader pattern of discriminatory conduct by Wells Fargo toward employees with disabilities who require remote work accommodations. In March 2023, a former Wells Fargo employee won a $22.1 million lawsuit for ADA discrimination in federal court in Charlotte, North Carolina, after the company failed to accommodate their medical condition that prevented them from returning to office work.

This precedent case demonstrates that Wells Fargo has previously been found liable for substantial damages for the very same type of ADA violations that Mr. Eltahir experienced. The significant jury award in that case reflects the severity of Wells Fargo's discriminatory practices and the substantial harm caused to employees with disabilities who are denied reasonable accommodations.

**M.**     **Impact on Mr. Eltahir's Career and Well-Being.**

Wells Fargo's discriminatory actions have caused significant harm to Mr. Eltahir both personally and professionally. The company's refusal to continue his reasonable accommodation and subsequent retaliatory termination have placed him at serious risk of another mental health crisis similar to the traumatic incident he experienced in the Wells Fargo office in 2022.

Mr. Eltahir reasonably believes that finding another position in the finance industry may be difficult given the circumstances of his termination and his disability-related employment history. The finance industry is a close-knit professional community, and Wells Fargo's actions may have damaged his reputation and future employment prospects in his chosen field.

The termination has also caused Mr. Eltahir to lose his health insurance and other employment benefits at a time when he particularly needs access to mental health services and disability-related accommodations. The stress of the discriminatory treatment and wrongful termination has exacerbated his underlying disability symptoms, creating additional barriers to his ability to seek and maintain alternative employment.

Furthermore, Wells Fargo's conduct has demonstrated a callous disregard for Mr. Eltahir's safety and well-being, demanding that he return to the very office location where he experienced



**Leveling the Field**

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059

thenoblelaw.com

Case 3:25-cv-00420-GCM-WCM    Document 35-4    Filed 07/18/25    Page 16 of 21



a life-threatening mental health crisis, without regard for the medical evidence documenting his need for remote work accommodation.

## LEGAL CLAIMS

Based on the foregoing facts, we believe that Mr. Eltahir has strong legal claims under federal law, including but not limited to: (1) failure to accommodate under the Americans with Disabilities Act; (2) discrimination under the Americans with Disabilities Act; and (3) retaliation under the Americans with Disabilities Act.

**A. Failure to Accommodate Under the Americans with Disabilities Act:** Mr. Eltahir can establish each element of a failure to accommodate claim under the ADA: (1) he is a qualified individual with a disability; (2) Wells Fargo was aware of his disability; (3) he requested a reasonable accommodation; and (4) Wells Fargo failed to provide a reasonable accommodation. Mr. Eltahir's psychosis/intermittent psychosis with social anxiety constitutes a disability under the ADA, as it substantially limits major life activities including working, concentrating, and interacting with others. His condition is thoroughly documented by qualified healthcare professionals, including Dr. Nathaniel Kouns, MD, and Kaitlin Sroka, CRNP.

Wells Fargo was clearly aware of Mr. Eltahir's disability, having initially approved his accommodation request in 2022 following his mental health crisis in their Charlotte office. The company had medical documentation explaining his condition and accommodation needs. Mr. Eltahir's request for continued remote work was reasonable, as demonstrated by his successful job performance while working from home from 2022 through early 2025. Remote work did not impose an undue hardship on Wells Fargo, particularly given that Mr. Eltahir had already proven he could perform all essential job functions effectively from his home office. Despite having medical documentation supporting his accommodation needs and his demonstrated ability to perform his job remotely, Wells Fargo refused to continue providing the reasonable accommodation and instead terminated his employment.

**B. Discrimination Under the Americans with Disabilities Act:** Mr. Eltahir can prove each element of a discrimination claim under the ADA: (1) he is a qualified individual with a disability; (2) he suffered an adverse employment action; and (3) the adverse action was taken because of his disability. As established above, Mr. Eltahir has a qualifying disability under the ADA and was performing his job successfully while receiving his accommodation. Wells Fargo's termination of his employment constitutes an adverse employment action. The timing and circumstances of his termination demonstrate that it was motivated by his disability and accommodation needs rather than any legitimate performance concerns.

The stated reason for termination - "professionalism and misconduct" - appears to be pretextual, as Wells Fargo provided no specific examples of alleged misconduct and Mr. Eltahir

**Leveling the Field**

Noble Law
thenoblelaw.com

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059

Case 3:25-cv-00620-RJC-DCK    Document 1-2    Filed 07/08/25    Page 17 of 21



had been performing his job duties successfully throughout his employment. The termination came directly after months of increasing pressure from HR and management regarding his accommodation needs and refusal to return to the office where he had previously experienced a life-threatening mental health crisis. Wells Fargo's own company policy stating that "telecommuting is usually our last option for accommodation" reveals an inherent bias against employees who require remote work accommodations for disability-related reasons, further supporting the inference of discriminatory intent.

**C. Retaliation Under the Americans with Disabilities Act:** Mr. Eltahir can establish each element of an ADA retaliation claim: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. Mr. Eltahir engaged in protected activity when he asserted his rights under the ADA by requesting continued accommodation and providing medical documentation supporting his disability-related need for remote work. His communications with HR regarding his accommodation needs and his refusal to return to the office due to his disability constitute protected opposition to discriminatory practices under the ADA.

The causal connection between Mr. Eltahir's protected activity and his termination is evident from the timing and circumstances surrounding his discharge. After asserting his accommodation rights in response to Wells Fargo's December 2024 return-to-office mandate, he was subjected to increasingly frequent and threatening meetings about returning to the office. Wells Fargo terminated him in May 2025, just months after he provided updated medical documentation supporting his accommodation needs. The company's failure to provide any specific examples of alleged "misconduct" and the rushed, unprofessional manner of his termination further demonstrate that the stated reason was pretextual and that the true motivation was retaliation for his assertion of disability rights under the ADA.

If successful on his ADA claims, Mr. Eltahir will be eligible to receive back pay, front pay, compensatory damages for pain and suffering, punitive damages, and attorneys' fees and costs, as well as other relief deemed appropriate by the court.

## PRESERVATION NOTICE

This letter hereby notifies Wells Fargo to preserve documents, including electronic data, that may be relevant in future litigation. Demand is hereby made for Wells Fargo to put in place chain of custody procedures to ensure that no relevant data is lost, erased, altered, or otherwise compromised. Further, if data has already been deleted, destroyed, altered or otherwise compromised on devices to your knowledge, please inform the undersigned immediately, describing in detail the data that was affected and the specific actions taken to delete, destroy, or alter the data. In addition, we hereby demand that you preserve all documents, tangible things, and electronically stored information ("ESI") potentially relevant to the issues described herein. Unless


thenoblelaw.com

**Leveling the Field**

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059





otherwise specified, the time period for the above-referenced documents spans from January 1, 2020 to the present. To the extent any requested documents may have been deleted, please also take steps to identify and preserve the relevant back-up tapes and computers so that the parties will have the option of retrieving those items forensically. Furthermore, if any of the potentially relevant documents are in the possession of a third party, please immediately notify the third party of this document preservation request and obtain copies of those documents.

I would urge you to immediately initiate a litigation hold for potentially relevant ESI, documents, and tangible things, and to act diligently and in good faith to secure and audit compliance with such litigation hold. Demand is further made for you to immediately identify and modify or suspend features of your information systems and devices that in routine operation operate to cause the loss of potentially relevant ESI. You should anticipate that your employees, officers, or others may seek to hide, destroy or alter ESI and act to prevent or guard against such actions. You should take affirmative steps to prevent anyone with access to your data, systems, and archives from seeking to modify, destroy or hide electronic evidence on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography or the like.)

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should not select methods to preserve ESI that remove or degrade the ability to search for ESI by electronic means or make it difficult or burdensome to access or use the information in litigation. You should further anticipate the need to disclose and produce system and application metadata, and application metadata and act to preserve it. As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions.

## SETTLEMENT PROPOSAL

Mr. Eltahir's termination was clearly discriminatory and retaliatory, violating his rights under the Americans with Disabilities Act. Although Mr. Eltahir would be well within his rights to simply file an EEOC Charge and federal court lawsuit, he has authorized us to attempt to reach reasonable terms on a pre-litigation settlement. To that end, Mr. Eltahir has authorized me to offer to settle and resolve his claims under the following terms:

**Monetary Terms:**

- Backpay/ front pay equivalent to 18 months' salary:        $31,000,000.00

- Value of lost benefits for 18 months:        $31,000,000.00





Leveling the Field

thenoblelaw.com

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059



- Compensatory Damages for Emotional Distress:     $29,000,000.00

- Contribution to Mr. Eltahir's attorneys' fees:     $31,850,000.00

- Other Monetary Measurements:

  Value of Demand Letter (Oct 6th 2025 - To Date) = $1,197,000.00 per day

  Debt - $10M corporate card for my family used as cash and credit for lifetime of company

  Equity - 5% ownership of company

- Judge, Jury, and Courtroom: $31,850,000.00

- Wells Fargo Collateral Management 2020 – 2025: $31,850,000.00

**TOTAL Monetary Settlement:**     **$186,550,000.00**

**Non-Monetary Terms:**

- Complete release of claims;

- Neutral employment reference clause;

- Complete copy of Mr. Eltahir's personnel file;

- Release of any non-compete or non-solicit to which Mr. Eltahir may be subject;

- Expungement of any negative references to Mr. Eltahir's termination from Wells Fargo's records.

<u>**CONCLUSION**</u>

Please be advised that this letter does not constitute an exhaustive statement of Mr. Eltahir's legal position and is not intended to be a complete recitation of the facts and laws pertaining to this matter and is sent without prejudice to any of Mr. Eltahir's rights and claims, all of which are expressly reserved.

Given the above factual summary, and notwithstanding the overall strength of his legal claims and breadth of remedies available, Mr. Eltahir is willing to resolve his claims without the need for litigation. If Wells Fargo is similarly amenable to resolving this matter without the need for litigation, I am happy to speak with you in greater detail about the circumstances surrounding Mr. Eltahir's claims and possible routes for settlement. I would ask that Wells Fargo responds to

**Leveling the Field**

Noble Law
thenoblelaw.com

Raleigh
919.251.6008

Charlotte
704.626.6648

South Carolina
864.565.9059



this letter on or before **Demand Letter To Date** to affirm its interest in resolving this matter amicably, and to confirm that Wells Fargo is taking the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this matter.

It is my hope that we can work out an arrangement that ensures the future success of both Wells Fargo and Mr. Eltahir.

**Leveling the Field**

**Noble Law**
thenoblelaw.com

**Raleigh**
919.251.6008

**Charlotte**
704.626.6648

**South Carolina**
864.565.9059